Filed 1/15/15  P. v. Alvarado CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066501 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB701206) |
| MARCOS ALVARADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, William Jefferson Powell, IV, Judge.  Reversed.

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Marcos Alvarado guilty of one count of first degree murder (Pen. Code, § 187, subd. (a));[1] and one count of attempted murder, with the further finding that the attempted murder was committed willfully, deliberately and with premeditation (§§ 187, subd. (a), 664, subd. (a)). For both counts the jury also made true findings on firearm allegations. (§ 12022.53, subds. (b), (c), (d).) Alvarado admitted a prior strike, and the trial court sentenced Alvarado to prison for a term of 130 years to life.

Alvarado contends that the trial court prejudicially erred by refusing to instruct the jury on voluntary manslaughter under the theory of imperfect self-defense despite defense counsel's request for that instruction. We conclude that the trial court erred in refusing to give the instruction, and the error was prejudicial. We accordingly reverse the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On April 8, 2007, at approximately 1:30 a.m., Alvarado stood near a vehicle in the parking lot of the Zendejas restaurant and bar in Colton, California, and fired at least six shots into the vehicle. The vehicle's driver, Isabel Fernandez (Isabel),[2] incurred a non-fatal bullet wound to her stomach. Isabel's husband, Jonathan Fernandez (Fernandez), was in the front passenger seat and incurred a fatal bullet wound to his chest, as well one

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]    At the time of the shooting, Isabel had the surname Fernandez, but at the time of trial she had the surname Flores. For the sake of clarity, we will refer to Isabel by her first name, and we intend no disrespect by doing so.

2

bullet wound to his head and one to his back. Fernandez's sister, Tina Fernandez (Tina),[3] who was in the back seat of the vehicle, was not shot.

Alvarado fled to Mexico immediately after the shooting, and was eventually arrested there in 2010. Alvarado was charged with one count of first degree murder for Fernandez's death and two counts of attempted first degree murder based on his act of shooting at Isabel and Tina inside the vehicle.

At trial, the People presented several witnesses who described the shooting and the events leading up to it, and Alvarado testified in his own defense. As all of the witnesses testified, during the evening of the shooting Alvarado and his girlfriend, Lizette Rios, were sitting at one of the tables inside Zendejas. Fernandez, Isabel, Tina, and their friend Jesse Roque were sitting at a second table. Nearby was a third table of four or five men (the men from the third table). According to Tina, Isabel and Roque, no one from their group interacted with anyone at the other tables, as they did not know them.

Witnesses described some kind of conflict inside the restaurant between Alvarado and the men from the third table. A waitress saw Alvarado approach the men from the third table several times, looking slightly angry. Tina observed Alvarado arguing loudly with his girlfriend, Rios, and giving angry looks to the men from the third table because Alvarado thought that the men "kept checking his girlfriend out." Isabel saw Alvarado get up and go over to the men from the third table to argue with them. A security guard

---

[3]    To avoid confusing her with her brother, we will respectfully refer to Tina Fernandez by her first name.

3

eventually asked Alvarado to leave the restaurant. According to one witness, Alvarado was aggressive toward the security guard.

Alvarado testified that his conflict with the men from the third table arose because the men made several gang-related comments to him. One of the men said, "This is Colton" to Alvarado, which he understood as the man "trying to bang on" him. According to Alvarado, although he had numerous visible gang-related tattoos, he had not been an active gang member for several years, and thus told one of the men, "I don't fuck around" and "I don't bang," but the man just smirked at him. Alvarado interacted with the men twice more during the evening. After seeing the men talking about him, Alvarado walked by them and said, "Hey, I already told you guys, I got no problem." Later, Alvarado went over to the men and said, "It's cool" and tried to shake hands with one of the men, but his hand was slapped away. A security guard then came up and asked Alvarado to leave. Alvarado also testified that Fernandez's group appeared to know the men from the third table because Alvarado saw one of the men from Fernandez's group go over and shake hands with the men from the third table.

According to the evidence at trial, the Fernandez party left the restaurant around the same time that Alvarado and Rios left. As Alvarado was leaving the restaurant, he went into the restroom while Rios went to Alvarado's truck. Rios backed the truck out of its parking space and hit a parked car. A security guard told Rios to give him the keys to the truck and to wait until she was able to exchange insurance information with the owner of the other car. When Alvarado came out into the parking lot, he saw what had happened and became upset and angry that the security guard would not let them leave,

4

calling the security guard a "fucking rent a cop." The security guard went inside the restaurant to call the police. Alvarado walked over by his truck.

Meanwhile, Fernandez's group had exited the restaurant and was trying to leave the parking lot. Roque had driven on his own to the restaurant, and he could not pull his car out of its parking space because Alvarado's truck was left in a position that blocked Roque's car. Roque sat on the trunk of his car while he waited for Alvarado's truck to be moved.

Fernandez, Isabel and Tina walked to their Chevy Tahoe and Isabel pulled out into the parking lot. A friend, who managed the restaurant, stopped to speak with Fernandez, Isabel and Tina after they backed out. The Tahoe then pulled up near Alvarado's truck and Roque, and the shooting occurred a short time later. Alvarado and the other witnesses gave different accounts of the shooting.

Based on the testimony of Isabel, Tina, Roque, the restaurant manager and a security guard, when the Tahoe drove up near Roque, Fernandez shouted out to Roque to ask him what was going on and why he wasn't leaving.[4] Alvarado reacted as if he thought Fernandez was shouting at him, and said something such as "[A]re you talking to me?" or "What did you say?" According to witnesses, Fernandez said, "I wasn't talking to you" or "It's cool."

---

[4] Roque described the latter part of his conversation with Fernandez, after he already told him that he was blocked by Alvarado's truck and Fernandez had waited for a while, as follows: "[Fernandez] rolls down the window. I said what's up? Let's go fool. I was like, man, it's cool." On cross-examination, however, Roque denied testifying that anyone used the term "fool."

5

Alvarado reached into his truck and took out a .32 caliber gun.[5]  Alvarado loaded the gun, stepped toward the Tahoe and started shooting.  Fernandez turned to Isabel and Tina to push their heads down.  Alvarado fired at least six shots at the Tahoe and then ran away while the security guard shot at him.  Isabel, who was shot in the stomach, drove the Tahoe to the hospital, where Fernandez later died from one of the three gunshot wounds he incurred.

According to Alvarado's testimony, when he entered the parking lot after using the restroom, he noticed some of the men from the third table in the parking lot.  Specifically, Alvarado observed a total of five men in the parking lot, including Roque who was by the trunk of his car.  As the security guard went inside the restaurant to call the police and Alvarado walked toward his truck, Alvarado heard Roque say "What's up now, fool?"  Alvarado then saw the men in the parking lot gesture toward each other and make eye contact.  The men in the parking lot stood up like they were going to start walking as the Tahoe drove up toward Alvarado's truck.

Alvarado became concerned about being attacked by the men in the parking lot, so he reached into his truck and pulled out a gun while the Tahoe drove up.  According to Alvarado, he kept a gun in his car because during the years of his active gang involvement he had been the victim of two shootings, including a drive-by shooting in which he was seriously injured, and he was afraid of being shot again.

---

[5]      One witness, Isabel, testified she saw Alvarado take the gun out of his pants.

As the Tahoe drove up, Alvarado saw Fernandez in the passenger seat. According to Alvarado, Fernandez had the window down and was raising his hand while holding a revolver. Alvarado was scared and thought he was going to be shot. After seeing Fernandez's gun, Alvarado pulled out his gun and shot at the Tahoe several times. Alvarado testified that he heard a loud gunshot "almost simultaneous" with his own gunshot, although he was not sure where the gunshot was coming from. He testified, "my mind thinks it is this guy in front of me, but that sound is kind of coming from the back." Alvarado was not sure how many times he was shot at. Alvarado ran a few blocks to his brother's house where he discarded his gun in the trash and then fled to Mexico where he was arrested more than three years later.

No witness other than Alvarado reported seeing Fernandez with a gun or seeing the men from the third table in the parking lot.

The jury found Alvarado guilty of one count of first degree murder for Fernandez's death (§ 187, subd. (a)), and one count of attempted murder with Isabel as the victim (§ 187, subd. (a), 664, subd. (a)), with the further finding that the attempted murder was committed willfully with premeditation and deliberation, and a true finding on firearm allegations for both counts (§ 12022.53, subds. (b), (c), (d)). The jury found Alvarado not guilty of attempted murder with Tina as the victim. After Alvarado admitted a prior strike, the trial court imposed a prison term of 130 years to life.

II

DISCUSSION

During discussion of jury instructions, Alvarado requested that the trial court instruct the jury with CALCRIM No. 571, which states that a defendant who commits a killing based on imperfect self-defense is guilty of voluntary manslaughter, not murder. The trial court refused to give the instruction, deciding to instruct the jury only on the theory of perfect self-defense. The sole issue on appeal is whether the trial court prejudicially erred by refusing to instruct the jury with CALCRIM No. 571 that Alvarado would be guilty of voluntary manslaughter if he acted in imperfect self-defense.[6]

A.    *Applicable Legal Standards*

"Self-defense is *perfect* or *imperfect*. For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent

---

[6]    With the inapplicable optional and parenthetical language removed, CALCRIM No. 571 provides in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: 1. The defendant actually believed that (he/she) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 571.)

8

danger of death or great bodily injury. [Citation.] A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. [Citation.] [¶] One acting in imperfect self-defense also actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable." (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*).) Specifically, " ' "[u]nder the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)[7] "The sole difference between true self-defense and 'unreasonable self-defense' is that the former applies only when the defendant acts in response to circumstances that cause the defendant to fear, and would lead *a reasonable person* to fear, the imminent infliction of death or great bodily injury [citation]; unreasonable self-defense, on the other hand, does not require the defendant's fear to be reasonable." (*People v. Barton* (1995) 12 Cal.4th 186, 199-200 (*Barton*).)

---

[7] Recently, in *People v. Elmore* (2014) 59 Cal.4th 121, 146 (*Elmore*), our Supreme Court further refined the concept of imperfect self-defense by explaining that "defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness. But defendants who contend they killed in self-defense because of a purely delusional perception of threat must make that claim at a sanity trial." Here, there is no suggestion that Alvarado was acting under a purely delusional perception when committing the shooting. Instead, he based his acts on his perception of the actual circumstances.

Voluntary manslaughter arising from imperfect self-defense is "a lesser offense included in the crime of murder." (*Barton*, *supra*, 12 Cal.4th at pp. 193, 200-201.) "A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561 (*Duff*).) Thus, as with any lesser included offense, "[w]henever there is substantial evidence that the defendant killed in unreasonable self-defense, the trial court must instruct on this theory of manslaughter." (*Elmore*, *supra*, 59 Cal.4th at p. 134.) The need to instruct "arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial.' " (*Barton*, *supra*, 12 Cal.4th at p. 201.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162-163.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive.' " (*Barton*, at p. 201, fn. 8.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Breverman*, at p. 162.)

Contrary to a suggestion in Alvarado's briefing, the same legal standard applies to the trial court's obligation to instruct on imperfect self-defense whether or not the defendant makes a request for the instruction. In all instances, the instruction must be given if there is substantial evidence to support it. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1215 [" ' "a trial court must instruct on lesser included offenses, even in the absence

of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present" ' " and "[c]onversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction' "].)  Accordingly case law considering whether a trial court erred in not sua sponte instructing on imperfect self-defense is just as applicable as case law considering whether the trial court erred in denying a defendant's request for such an instruction.

" 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' "  (*People v. Banks* (2014) 59 Cal.4th 1113, 1160.)

B.  *Substantial Evidence Supported the Giving of an Instruction on Imperfect Self-Defense*

According to the applicable legal standards, we examine whether there was substantial evidence presented at trial that could have supported a jury finding that Alvarado shot at the Tahoe and killed Fernandez "in the actual but unreasonable belief that he [was] in imminent danger of death or great bodily injury."  (*Duff*, *supra*, 58 Cal.4th at p. 559.)  As we will explain, Alvarado's testimony described a scenario under which the jury could have found that Alvarado acted in imperfect self-defense.

As CALCRIM No. 571 instructs, a "defendant acted in imperfect self-defense if: 1. The defendant actually believed that (he/she) was in imminent danger of being killed or suffering great bodily injury;  [¶]  AND  [¶]  2. The defendant actually believed that

11

the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Based on Alvarado's testimony, which the jury was entitled to credit, there is no dispute that the evidence supported two of the predicate factual findings for imperfect self-defense as set forth in CALCRIM No. 571, namely that Alvarado (1) "actually believed that [he] was in imminent danger of being killed or suffering great bodily injury"; and (2) "actually believed that the immediate use of deadly force was necessary to defend against the danger." (CALCRIM No. 571.) As Alvarado testified, he thought that he was being attacked by a group of gang members and that Fernandez was part of the group of gang members because he had seen someone from Fernandez's group shake hands with the men from the third table. Alvarado was afraid of being shot, especially because he was the victim of a previous drive-by shooting. Therefore, when Alvarado saw Fernandez raise a revolver, he thought that Fernandez was preparing to shoot, and he opened fire and shot at the Tahoe. Indeed, by agreeing to instruct on *perfect* self-defense the trial court tacitly recognized that the evidence would support a finding that Alvarado actually believed that he was in imminent danger of being killed or suffering great bodily injury and that the situation required the immediate use of deadly force.[8]

---

[8] Just like the theory of *imperfect* self-defense, the theory of *perfect* self-defense requires a jury to find that the defendant "believed that [he] was in imminent danger of being killed or suffering great bodily injury," and that "the immediate use of deadly force was necessary to defend against that danger." (CALCRIM No. 505.)

12

The main difference between imperfect self-defense and perfect self-defense is that perfect self-defense requires a defendant's *reasonable* belief in the need for deadly force, but imperfect defense applies when the defendant's belief was *unreasonable*. (*Barton*, *supra*, 12 Cal.4th at pp. 199-200; compare CALCRIM No. 571 with CALCRIM No. 505.) Although it found the requirements for perfect self-defense to be present, the trial court declined to instruct on imperfect self-defense, reasoning that if the jury credited Alvarado's testimony that Fernandez was pointing a gun at him, it only could have found *perfect* self-defense, not *imperfect* self-defense. According to the trial court's reasoning, if Fernandez was pointing a gun at Alvarado, a jury would necessarily find that it was *reasonable* for Alvarado to believe he was in imminent danger of great bodily injury and that it was *reasonable* for Alvarado to believe that the immediate use of deadly force was necessary to defend against that danger. As we will explain, we disagree with the trial court's evaluation of the evidence.

The trial court's view of the evidence was flawed because, based on the record, a jury could find that Alvarado *actually believed* that Fernandez was going to shoot him if he did not shoot first, but that belief was *not reasonable*. The jury could have determined that even if, as Alvarado testified, he saw Fernandez with a revolver in his hand, it was not reasonable to conclude that Fernandez was about to shoot the revolver. Alvarado was in an angry and agitated emotional state in the parking lot and felt trapped because the security guard had the keys to his truck. Alvarado had a conflict with the men from the third table and was ejected from the restaurant. Alvarado thought the men from the third table had followed him into the parking lot, and he incorrectly believed that Fernandez

13

and Roque, who were also in the parking lot, were associated with those men because he witnessed a hand shake between the two groups inside the restaurant. Based on those facts, the jury could have determined that when Alvarado saw the men gesturing to each other in the parking lot while Fernandez drove up holding a revolver, Alvarado unreasonably overreacted and concluded he was going to be shot in a coordinated gang-motivated attack. Accordingly, substantial evidence supported giving an instruction on imperfect self-defense.

Our Supreme Court recently recognized that it is proper for a trial court to refuse to instruct on imperfect self-defense when the defendant's own version of events, if credited, would, as a matter of law, amount to *perfect* self-defense because the victim shot first. (*Duff*, *supra*, 58 Cal.4th at p. 562.) However, this is not such a case because there is no evidence, even under Alvarado's testimony, that Fernandez shot first. In *Duff*, the defendant claimed that he shot at the victims in their vehicle only after the victims pointed multiple guns at him and opened fire. (*Id*. at pp. 534-535.) Our Supreme Court explained that an instruction on imperfect self-defense was not required because the victims shot first. "The problem . . . is that if believed, [the defendant's] version could lead only to a finding of justifiable homicide and a total acquittal on the homicide charges. The use of lethal force in response to being shot at repeatedly is perfect self-defense and no crime. [Citations.] While [the defendant] argues the jury could have concluded he unreasonably misperceived the situation, the circumstances described by [the defendant] leave no room for such shades of gray. Either, he was attacked, in which

14

case he committed no crime, or he was not, in which case he committed murder." (*Id*. at p. 562.)

Other case law employs similar reasoning to *Duff* in concluding that an instruction on imperfect self-defense is not warranted when the defendant's version of events, if credited, would *necessarily* lead to a finding of *perfect* self-defense. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1232 [it was not error to refuse an instruction on imperfect self-defense because the defendant's testimony that he heard the victims shooting at him before he shot at them "if the jury believed him, could only lead to a conclusion that he acted in justifiable self-defense . . . , not to a conclusion that he acted in imperfect self-defense"]; *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1275 [instruction on imperfect self-defense not required because "[d]efendant's statements, if believed by the jury, could only lead to an acquittal based on justifiable homicide. It is inconceivable a jury could find defendant (who had earlier been attacked by [the victim] with a knife, and whose life was spared only because others intervened) acted unreasonably in killing [the victim] after [the victim] once again attacked him with a knife"]; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 ["[w]here, as here, the defendant's version of events, if believed, establish[es] actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the instruction"].)

Alvarado's version of events, unlike the defendant's statement in *Duff*, "leave[s] room for . . . shades of gray" on the question of whether it was reasonable for Alvarado to believe that the immediate use of deadly force was necessary in the situation. (*Duff*,

15

*supra*, 58 Cal.4th at p. 562.)  Although, as *Duff* explains, a person being shot at may use lethal force in response (*ibid*.), Alvarado did not testify that he was being shot at before he opened fire on the Tahoe, and he did not describe any other act taken by Fernandez that justified the use of deadly force as a matter of law.  Therefore, the jury could have found that Alvarado overreacted to the situation based on his emotional state and unreasonably perceived that Fernandez was about to shoot him if he did not shoot first.

Because Alvarado's testimony, if credited by the jury, left room for a finding that Fernandez was *not* about to shoot and that Alvarado therefore acted unreasonably, this case falls into the category of other cases where an imperfect self-defense instruction was required because defendant's version of the facts could support a finding that the defendant *unreasonably* concluded that the situation made it necessary to use deadly force.  (*Barton*, *supra*, 12 Cal.4th at pp. 202-203 [when the defendant testified that he fired his gun at the victim because he thought he saw the victim coming at him with a knife, an instruction on imperfect self-defense was required because "[b]ased on all the evidence, the jury could reasonably conclude that [the victim] was unarmed, but that defendant, his judgment clouded by his anger, unreasonably believed that [the victim] was armed and trying to attack him, and that defendant deliberately fired his gun in response to this perceived threat"]; *People v. Ceja* (1994) 26 Cal.App.4th 78, 86 ["While defendant testified that the victim pulled a gun from his waistband and that defendant saw the barrel of the victim's gun before defendant shot the victim, no gun was found at the scene and prosecution witnesses testified that the victim did not have a gun. . . .  The jury was entitled to accept portions of a witness's testimony and to disbelieve other portions

16

[citation] and might well have concluded that defendant was mistaken about the victim being armed but also have concluded that defendant honestly but unreasonably believed his life was in danger"]; *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263 [when the evidence showed that someone shot at defendant first, but the defendant could have been mistaken about the shot coming from the direction of the victim, the evidence supported an instruction on imperfect self-defense]; *People v. Campbell* (2014) 227 Cal.App.4th 746, 763 [imperfect self-defense instruction should have been given based on defendant's testimony that he reacted by shooting when he heard someone shout "gun, gun" and believed that "people from the opposing group of people were 'coming out with guns' "].)[9]

We therefore conclude that the trial court erred in refusing to instruct on voluntary manslaughter under the theory of imperfect self-defense as set forth in CALCRIM No. 571.

---

[9]     Further, even if the jury concluded that Alvarado reasonably believed that Fernandez was about to shoot, the jury still could have concluded Alvarado acted unreasonably by deciding to *continue* to shoot, for a total of at least six shots, when the perceived threat from Fernandez had been neutralized by one of the earlier shots. Focusing on witness testimony that the occupants of the Tahoe ducked down in response to Alvarado's shots, and on Alvarado's own testimony that after he started shooting at the Tahoe, he heard gunshots that sounded like they were coming from somewhere behind him, not from the Tahoe, the jury could have concluded that although it may have been reasonable for Alvarado to fire an initial shot at the Tahoe to defend against a perceived threat from Fernandez's gun, under the circumstances it was not reasonable to continue to fire a total of six shots. (See *People v. Shade* (1986) 185 Cal.App.3d 711, 716 [belief in need for self-defense no longer reasonable after victim, who threatened defendant with a gun, had already been beaten unconscious].)

17

C.      *The Error Was Prejudicial*

Having concluded that the trial court erred in refusing to instruct on imperfect self-defense, we next examine whether the error was prejudicial.

An error in failing to instruct on imperfect defense "is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. . . . ' "A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." ' " (*People v. Randle* (2005) 35 Cal.4th 987, 1003 (*Randle*).) " ' " [A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*.' " ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 351 (*Wilkins*) [discussing instructional error].) Here, as we will explain, there is a reasonable probability that, had the jury been instructed on imperfect self-defense, it would have found the requirements of imperfect self-defense to be present, leading to a verdict of voluntary manslaughter and attempted voluntary manslaughter rather than murder and attempted murder.

In determining whether an error in failing to instruct on imperfect self-defense was prejudicial, we may look to the strength of the evidence supporting the applicability of the omitted instruction. (*People v. Moye* (2009) 47 Cal.4th 537, 556 [in evaluating prejudice, " 'an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a

18

different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result' "].)  At trial two main competing theories were offered as to why Alvarado opened fire on the Tahoe.  Defense counsel argued that Alvarado opened fire because he saw Fernandez with a gun and believed that Fernandez was about to attack him in coordination with other gang members who had been bothering him inside the restaurant.  That theory was supported by the substantial evidence of Alvarado's own testimony about what occurred in the parking lot.  The prosecutor, in contrast, relying on other witnesses' testimony about what they saw in the parking lot, argued that Alvarado could not have seen Fernandez with a gun, and that, instead, Alvarado opened fire on the Tahoe because he felt that Fernandez had disrespected him by "brush[ing] him off" when Alvarado asked "What did you say" or "Are you talking to me?"

Based on the evidence presented at trial, Alvarado's version of events is no less plausible than the version presented by the prosecutor.  Indeed, a reasonable juror might have determined it was *more likely*, under the circumstances, that Alvarado opened fire because he feared an imminent attack rather than that he opened fire on someone with whom his only interaction was a brief exchange of words in the parking lot.  We therefore, conclude that there is a reasonable probability, not just an " 'abstract possibility' " (*Wilkins*, *supra*, 56 Cal.4th at p. 351), that the jury could have believed that Alvarado shot at the Tahoe because he believed he needed to defend himself, but that Alvarado's belief was unreasonable.  Where, as here, the evidence is sufficiently strong that there is a reasonable probability that a jury could have found the doctrine of

19

imperfect self-defense to apply, it is prejudicial error for the trial court to have failed to give the instruction. (See *Randle*, *supra*, 35 Cal.4th at p. 1004 [failure to instruct on imperfect self-defense of another was prejudicial when the evidence was susceptible of the interpretation that the defendant held an unreasonable belief in that a third party was in imminent danger of death or great bodily injury]; *Viramontes*, *supra*, 93 Cal.App.4th 1256, 1263-1264 [the trial court's failure to instruct on imperfect self-defense could not be deemed harmless given the evidence at trial making the instruction applicable and giving rise to a reasonable probability that a properly instructed jury would have found appellant guilty of manslaughter on an imperfect self-defense theory].)

In determining that the error was prejudicial, we acknowledge that a trial court's failure to instruct on imperfect self-defense may be harmless if other aspects of the jury's verdict establish that the jury rejected the factual basis necessary for a finding of imperfect self-defense. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."].) However, this is not such a case. No other aspect of the jury's verdict indicates that, if given the opportunity, the jury would have rejected the necessary factual predicates of imperfect self-defense, namely that (1) Alvarado believed he was in danger of being seriously injured or killed; and (2) Alvarado believed it was immediately necessary for him to use deadly force; but (3) one of those beliefs was unreasonable. The jury's verdict of first degree murder reflects a finding that Alvarado acted willfully, with premeditation and deliberation, in

20

shooting at the Tahoe, but that finding is not incompatible with any of the necessary elements of imperfect self-defense. The jury could have concluded that Alvarado unreasonably believed he was going to be attacked in the parking lot, requiring deadly force, and that he premeditated and deliberated while deciding what he was going to do in reaction to the anticipated attack while getting his gun and loading it.[10]

Significantly too, the record shows that the jury had difficulty with this case, taking multiple days to reach a verdict and informing the trial court that it was "hung" before ultimately reaching a decision. We may take into account the jury's difficulty in reaching a verdict in determining whether the trial court's failure to instruct on an applicable lesser included offense was prejudicial, as it shows that the prosecution's case for the eventual verdict on the greater offense was not overwhelmingly strong. (*Randle*, *supra*, 35 Cal.4th at p. 1004 ["In concluding the failure to give the instruction was prejudicial, we note the jury, even without having been instructed on this theory, took five days to reach its decision."]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1180 ["The court's erroneous refusal to instruct on imperfect self-defense was not harmless[,]" in part because "[t]he murder charge against appellant was not airtight[,]" as "[j]ury deliberations spanned three days for an uncomplicated one-count case turning on appellant's state of mind when he fired his gun."].)

---

10      Further, because Alvarado shot at least six times into the Tahoe, a reasonable jury could decide that Alvarado had sufficient time to premeditate and deliberate between those shots, even though motivated to start shooting by the unreasonable belief that he was under attack.

We conclude that the trial court prejudicially erred, as it is reasonably probable that, had the jury been instructed with CALCRIM No. 571 on the theory of imperfect self-defense, Alvarado would have obtained the more favorable outcome of a verdict of voluntary manslaughter and attempted voluntary manslaughter.

DISPOSITION

The judgment is reversed and this action is remanded for further proceedings.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.